IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs July 15, 2025

**STATE OF TENNESSEE v. ENOCH ZARCENO TURNER**

**Appeal from the Criminal Court for Shelby County**
No. 20-01563      Chris Craft, Judge

_____

**No. W2024-01191-CCA-R3-CD**

_____

The Defendant, Enoch Zarceno Turner, was convicted of two counts of first-degree premeditated murder, first-degree murder in the perpetration of aggravated child abuse, aggravated child abuse, aggravated arson, and especially aggravated burglary, for which he received an effective sentence of life without parole. The sole issue raised on appeal is whether the State established the identity of the Defendant as the perpetrator of each of the offenses. Upon our review, we affirm the judgments of the trial court.

**Tenn R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, and J. ROSS DYER, JJ., joined.

Joseph McClusky and William Massey, Memphis, Tennessee, for the appellant, Enoch Turner.

Jonathan Skrmetti, Attorney General and Reporter; Raymond J. Lepone, Assistant Attorney General; Steve Mulroy, District Attorney General; and Eric Christensen, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In the early morning hours of September 13, 2019, the Defendant entered the home of his former girlfriend, H.C., and killed H.C. and B.C., their four-month-old son, by stabbing H.C. over one-hundred times and by stabbing B.C. ten times. Before leaving the home, the Defendant set on fire the bed the victims had been sleeping on. The State theorized the Defendant killed the victims because when H.C. became pregnant with B.C., he did not want to be a father, he had been angry H.C. would not get an abortion and was

"ruining his life," and upon the birth of B.C., H.C. pursued child support from the Defendant. The Defendant provided a statement to law enforcement during which he eventually admitted to entering H.C.'s home and observing the lifeless bodies of the victims. However, the Defendant claimed to have immediately left the home, and he denied any involvement in the deaths of the victims. For his actions, on June 30, 2020, the Shelby County Grand Jury indicted the Defendant with two counts of first-degree premeditated murder, first-degree murder in the perpetration of aggravated child abuse, aggravated child abuse, aggravated arson, and especially aggravated burglary.

The Defendant's five-day jury trial began on May 7, 2024. Kassye Howell, H.C.'s sister, testified that on the morning of September 13, 2019, she found the bodies of H.C. and her four-month-old son B.C. in their home. On that morning, she received a text message from B.C.'s babysitter stating that H.C. had not dropped off B.C. yet, and that the babysitter could not get in contact with H.C. Howell and her friend, Aubrey Spencer, went to H.C.'s home to check on her. Howell stated that when the two entered the home, they immediately went upstairs to H.C.'s bedroom. Upon reaching the closed bedroom door, Howell noticed that the doorknob was unusually hot. When Howell opened the door, she observed that the room was dark and "there was soot kind of just falling everywhere." Howell stated that she immediately saw H.C. lying on the floor, face down, and recognized that she was deceased. She did not see B.C. Howell said she immediately called 911.

Deputy Shalamar Dunn was assigned to uniform patrol for the Shelby County Sherriff's Office in 2019. He was dispatched to H.C.'s home on a "fire call" around nine o'clock on the morning of the offense. When he arrived at the scene, he met Howell and Spencer who were frantic and told him about H.C. and that they believed B.C. was missing. When Deputy Dunn entered the home, he did not smell smoke until he went upstairs. When he went to H.C.'s room, he noticed that the room was pitch black and dark. Deputy Dunn observed H.C. lying face down on the floor, covered in soot. At first glance, Deputy Dunn believed H.C. was shot because her back was "peppered" with a distinct pattern. He then looked at the bed and saw B.C. lying in the middle of the bed. Deputy Dunn noticed that B.C.'s stomach was cut open and his "intestines were protruding out of the torso." Once he discovered both victims, he notified his supervisor and secured the scene. Deputy Dunn secured the scene until first responders arrived. The video from the body camera worn by Deputy Dunn was admitted into evidence and played for the jury.

Kyle Bourke, a fireman for the Shelby County Fire Department, arrived on the scene and learned that there were two victims inside the home. He observed that the bedroom was the only room in the house impacted by the fire. Upon entering H.C.'s bedroom, Bourke observed that the bodies of the victims were charred, burned, and deceased. He also saw B.C. in the middle of the bed in a blue nighty and noticed his stomach contents were "spilled out" onto the bed next to him. Bourke declared a time of death for both

victims. Bourke testified that his focus then turned to protecting the crime scene and advised officers on the scene that he may have stepped on a deceased dog in the room.

Kristyn Meyers, a special agent forensic scientist supervisor with the Tennessee Bureau of Investigation, was declared an expert in forensic biology and DNA analysis. Meyers described the DNA testing process, including obtaining, evaluating, and comparing DNA profiles to known DNA standards. She also explained that it is possible for Bluestar, a chemical test for blood, to yield positive results in the presence of bleach, chlorine-based cleaning agents, or chlorine-based pool water. Meyers prepared four reports regarding blood and DNA testing conducted from evidence in this case.

In the June 24, 2020 report, Meyers tested multiple samples from the Defendant's vehicle. Chemical testing of swabs from the interior of the driver's side door, a vehicle seat cover, and middle console did not indicate the presence of blood and no further testing was conducted. A knife with a black handle was also recovered from the vehicle. The blade of the knife yielded a DNA mixture of two individuals, with the Defendant as the major contributor of DNA. Meyers explained that the Defendant being a major contributor of DNA meant that the majority of the DNA profile matched the Defendant. Due to the limited minor contributor profile obtained from the sample, her interpretation of the minor contributor's DNA profile on the knife was inconclusive. Meyers also tested a sample obtained from both the outside and inside of a glove found in the vehicle. The DNA profile from the outside of the glove was consistent with at least two individuals, with the Defendant as the major contributor of DNA. The DNA profile from the inside of the glove was consistent with at least two individuals, including at least one male. However, interpretation of the DNA profile of the inside of the glove was inconsistent due to the limited profile obtained. In other words, there was not enough of the sample to make a comparison.

The June 24, 2020 report also included samples obtained from H.C.'s home. Meyers tested a swab from the upstairs bathroom interior door which indicated the presence of human blood. The DNA profile from the swab matched two individuals, including at least one male. The major contributor profile matched H.C. Meyers explained that the male DNA profile also found from the swab was a minor contributor; however, the DNA sample was "not suitable for comparison, and the interpretation is inconclusive." Additionally, Meyers tested two swabs from the kitchen shutters. The first swab indicated the presence of blood and matched the DNA profile of H.C. The second swab from the kitchen shutters also indicated the presence of blood and matched the DNA profile for B.C.

Meyers produced a second report on December 20, 2020, which included samples obtained from windows in H.C.'s home. A swab recovered from the interior of a kitchen

window of the home contained DNA matching H.C. A swab obtained from the edge of the rear window contained DNA matching the Defendant.

Meyers conducted the third report on February 3, 2020. A swab obtained from the passenger seat of the Defendant's car indicated the presence of blood and matched the Defendant's DNA. A sample collected from the upstairs toilet seat of H.C.'s home indicated the presence of blood and matched H.C.'s DNA. Meyers also tested a swab obtained from the rear patio garden hose storage box of the home, which indicated the presence of blood and matched H.C.'s DNA.

Lastly, Meyers tested the fingernail clippings from H.C.'s left and right hand. The left nail clippings did not contain enough DNA for analysis. Meyers explained that there was an indication of a small amount of male DNA present, but not enough to continue testing. However, an initial report indicated that the right nail clippings had enough male DNA to attempt to continue testing using a YSTR test, which specifically reviews DNA from the Y chromosome specific to male DNA. However, when Meyers attempted to test the right nail clipping, no YSTR profile was obtained because there was not enough male DNA present.

Jacob Haley, a fire marshal with the Shelby County Fire Department, testified as an expert in investigating the cause and origin of a fire. On September 13, 2019, Haley responded to a call to H.C.'s home. Upon arrival, Haley initially looked at the exterior of the home and eliminated the HVAC system, the gas meter, the electric meter, and other outside receptacles as being the potential cause for the fire. Upon entry into the home, Haley noticed that there was "no fire damage at all" to the first floor of the home. Haley then went to the second floor of H.C.'s home and discovered that a majority of the fire damage was in H.C.'s bedroom. He determined H.C.'s bedroom to be the room where the fire began. Haley stated that he first noticed that there were heavy soot marks on the exterior of the bedroom door, which indicated that the "door was shut while the fire occurred." After examining the room and eliminating any accidental causes, Haley determined that the fire started on the bed near B.C.'s feet. Haley opined that the charring of B.C.'s left foot indicated that the fire was set near his feet and "burned hottest [and] burned longest in the vicinity[.]" Haley stated that, from his investigation, he determined that the fire was intentionally set and "was done to conceal another crime." Although Haley admitted that he was not able to find the ignition source for the fire, he stated that it is possible that the fire was started with a cigarette lighter. On cross-examination, Haley stated that the fire likely lasted between thirty minutes to an hour before it died out on its own from lack of oxygen.

Detective George Selby, the lead investigator with the Shelby County Sheriff's Office, responded to a call requesting the homicide unit detectives report to H.C.'s home

on the morning of the offense. He stated that when he arrived, responding officers had already secured the scene. Upon arrival, Detective Selby explained that he conducted a walkthrough of the home to determine what type of crime occurred. He expressed that, at this point, his focus was to find evidence to determine whether the perpetrator was someone the victims knew or a stranger. As he canvassed the home, he discovered that the back window of the home had pry marks and smudges on the window, and things below the area of the window had been moved, appearing to make a way to get in and out of the home. He opined that this window was the point of entry. Detective Selby explained that every other window and door of the home was checked, and there was no evidence of forced entry into the home.

Detective Selby stated that as he went to the upstairs area of the home, he noticed soot on the handrail by the stairs as well as on the door frame of H.C.'s bedroom. He understood this to mean that someone was in the home after the fire, but acknowledged that family members, firemen, responding officers, detectives, and medical personnel were in the home after the fire and could have left the soot markings on the handrail. As he ascended the stairs, Detective Selby located H.C.'s bedroom and stood at the doorway to observe the room. He immediately saw H.C.'s dog deceased on the floor at the doorway. Next, he saw H.C. lying on the floor beside the bed, with several stab wounds on her head, neck, and back area. Detective Selby then saw B.C. in the center of the bed with stab wounds to his head and torso. Next, Detective Selby focused on the upstairs bathroom of H.C.'s home. He found H.C.'s cell phone in the toilet and bloody footprints on the floor of the bathroom.

Detective Selby testified that he believed the murders of both victims were targeted. He explained that while H.C. may have been a perceived threat to the perpetrator, B.C. "couldn't have been a threat to anybody" because he was only four months old. Detective Selby asserted that because [B.C.] couldn't identify anybody. . . couldn't have ran away. . . couldn't have attacked the suspect. . . it leads me to believe that there was a purpose in somebody killing both of them."

Detective Selby interviewed H.C.'s mother and sister and learned that the Defendant and H.C. had recently been in conflict over child support and had a court-ordered paternity test scheduled for the morning of the crime. From this information, he identified the Defendant as a person of interest. Detective Selby also entered the Defendant's license plate information into a license plate reader ("LPR") system, which placed the Defendant's vehicle at Whisky Jack's Bar on the evening of September 12, 2019, at 9:31 p.m. and 11:12 p.m. Later, at 2:21 a.m., the LPR placed the Defendant's vehicle on Germantown Trails, a road located immediately behind H.C.'s backyard.

Detective Selby testified regarding his interview with the Defendant. The Defendant initially claimed that he spent the evening at Whisky Jack's Bar for a birthday party, remained there until approximately 3:00 a.m., and then slept in his car until 6:00 a.m. He then went home. Over the course of questioning, however, the Defendant changed his account of what occurred several times. When Detective Selby confronted the Defendant with the LPR data that placed him near H.C.'s residence that evening, the Defendant admitted that he had driven through the area to "clear [his] head." The Defendant stated he parked on Germantown Trails and got out of his vehicle to smoke and to take a walk in the opposite direction of H.C.'s home. He stated that he never crossed the street in the direction of H.C.'s home. His story then evolved from never crossing the street to be near her home, to sitting near H.C.'s backyard fence, to eventually admitting that he scaled the backyard fence and entered her home through an open kitchen window. The Defendant described moving through the home, seeing H.C. lying face down unresponsive on the bedroom floor, and discovering B.C.'s motionless on the bed. He also admitted to stepping in something "soft or gooey[,]" when he entered H.C.'s bedroom, but claimed not to have touched either victim. Initially, the Defendant claimed not to have entered the bathroom of the home, but he later admitted to entering the bathroom.

Detective Selby explained that, during questioning, the Defendant gave different accounts of his actions after finding the bodies of the victims. He first stated that he immediately ran out of the house, returned to his vehicle, and left. He later stated that, while leaving through the backyard, his leg slipped into the pool before he exited the property. Later, when the Defendant's car was recovered by investigators, Detective Selby explained to the Defendant that an area inside the car reacted to BLUESTAR, a chemical that can indicate the presence of blood or cleaning agents such as chlorine or bleach. After being told these results, the Defendant changed his account and stated that he had fallen fully into the pool and was soaking wet. He also stated that he had gotten blood on his arms and hands from taking his shoes off and that he rinsed the blood from them.

The Defendant explained that after discovering the victims, he went home and did not contact the police. Later that morning, at approximately 11:00 a.m., the Defendant appeared for the scheduled paternity test. When asked at the appointment about the whereabouts of the other parties, meaning H.C. and B.C., the Defendant responded that he did not know and that he "thought they'd be here."

Detective Selby stated that after the Defendant admitted that he had entered H.C.'s residence, the Defendant gave varying accounts regarding the clothing he wore that night. He first stated that he disposed of his clothing at a hotel near Whisky Jack's Bar, but officers were unable to locate the clothing. Hours later, the Defendant stated that he had removed his clothes while driving down Shelby Drive and threw both the clothes and his shoes out of the car window. Officers searched the area but did not recover any items.

Detective Selby also explained that the Defendant initially described his attire as a Captain America shirt, shorts or jeans, and black shoes. Pursuant to a search warrant, officers searched his residence but did not find such items. When confronted with that fact, the Defendant stated instead that he had been wearing an Abercrombie and Fitch shirt, which was also never recovered. Investigators later obtained surveillance footage from Whisky Jack's Bar, which revealed that the Defendant had been wearing different clothing than he described that night, including distinctive blue shoes. None of the clothing or shoes depicted in the video were located. When told this, the Defendant stated that he had discarded the blue shoes a week earlier because they had torn. Detective Selby explained that this would have been impossible as the Defendant was wearing the shoes in the surveillance video, after the time he claimed to have discarded them. The Defendant also stated that his shirt was destroyed after it was caught in the fan belt of his car when he checked under the hood after experiencing car trouble. In another version, he stated that he had removed the shirt before working on the car due to the heat and may have left it on the trunk area of the vehicle when he drove off. The shirt was never found.

On cross-examination, Detective Selby stated that he investigated another individual, Austin Ash, after officers discovered a letter he had written to H.C. The letter indicated a conflict between Mr. Ash and H.C., stemming from an incident in which Mr. Ash called B.C. a derogatory name. In the letter, Mr. Ash was apologetic. Upon further investigation, Detective Selby discovered that Mr. Ash was incarcerated in Mississippi at the time of the murder and, therefore, "would not be responsible for the killing of [H.C. or B.C.]."

Detective Selby stated that there were some hairs visible in the upstairs bathroom of H.C.'s home, but they were not collected or tested because "at some point or [another] [detectives] decided that hair wasn't needed or there was no evidence, because of no roots." He further stated that he was not sure why detectives did not collect the hair found at the scene for testing, however, as lead detective, he trusted the other detectives that processed the crime scene to "do their jobs properly," and did not feel the need to "babysit" them.

Detective Selby also stated that the sooty footprints found in the bathroom had a distinctive diamond shaped pattern that was consistent with the soles of Vans shoes. He admitted that he did not verify whether anyone at the crime scene was wearing shoes with that same distinctive sole pattern. However, body-cam footage later showed that Aubrey Spence, the friend who discovered the victims along with Kassye Howell, was wearing Vans shoes when she entered the home and went upstairs towards the crime scene.

Detective Selby admitted that the Siemens Hemastix used to test for blood in the Defendant's vehicle were expired. The hematite sticks expired on July 31, 2019, and the test was performed on September 14, 2019.

Detective Selby stated that he did conduct a background check on the Defendant, and the Defendant did not have a violent criminal history. The Defendant also did not have fresh injuries at the time of his arrest, although he had older cuts on his arms that Detective Selby believed were consistent with his occupation as a mechanic. However, Detective Selby believed that they had arrested the correct person. He stated that he believed the Defendant killed H.C. out of spite and anger and killed B.C. to avoid responsibility and child support.

Juwan Fields, co-worker and friend of the Defendant, testified that on the night of September 12, 2019, he went to Whisky Jack's to attend a birthday party. Fields stated that the Defendant also attended the birthday party. Fields described the Defendant that night as "his normal self" and "the life of the party." He recalled that the Defendant was wearing blue Converse shoes that night. Fields left Whisky Jack's around 1:30 a.m. Fields stated that when he left, the Defendant was having sexual relations with Brittney Roberts in her vehicle. Fields went home and did not hear from the Defendant again until the next morning. That morning, he received a text from the Defendant that stated that he "needed to stop drinking," because he had "burnt up the starter in [his] car." The next time Fields heard from the Defendant was the next day around 2 a.m. The Defendant stated that he was "locked up" and told Fields that he went to H.C.'s home. Fields stated that he did not understand why the Defendant went to her home.

Brittney Roberts, a friend of the Defendant, testified that on September 12, 2019, she went to Whisky Jack's to celebrate a mutual friend's birthday. Roberts stated that she and the Defendant flirted the whole night. Then, around 2:00 am, they had sex in her car in the parking lot of Whisky Jack's. Roberts stated that she and the Defendant had a sexual relationship without commitment since the summer of 2019. Roberts went home after leaving Whisky Jack's and did not hear from the Defendant again until the next morning. Roberts stated the Defendant did not mention finding H.C. or B.C. deceased.

Dr. Danielle Harrell, an assistant medical examiner, testified as an expert in the field of forensic pathology. Dr. Harrell explained that Dr. Katrina Vanpelt performed the autopsies of both victims. Dr. Harrell testified to the autopsy records produced by Dr. Vanpelt. First, Dr. Harrell testified about the autopsy report for H.C. Dr. Harrell stated that H.C. sustained 130 stab wounds to her head, shoulders, neck, and back. H.C. suffered injury to her jugular vein and carotid artery, which would have been fatal. H.C. also had injuries to her hands, arms, and forearms, which were consistent with defensive wounds.

Dr. Vanpelt determined the cause of death was multiple sharp forced injuries, and the manner of death was homicide.

Dr. Harrell performed the autopsy of B.C. He sustained a total of 10 stab wounds to his face and torso. Dr. Harrell stated that the stab wounds to B.C.'s abdomen caused his internal organs to be exposed outside of his body. These wounds were fatal. B.C. also had thermal injuries to his hands, feet, and legs. Dr. Harrell also discovered soot in B.C.'s esophagus and lungs, indicating that he was still breathing at the time of the fire. Dr. Harrell determined the cause of death was multiple sharp forced injuries, and the manner of death was homicide.

Lieutenant Dennis Evans, an officer with the Memphis Police Department's ("MPD") Digital Forensic Unit, was qualified as an expert in digital forensics. Lieutenant Evans reviewed data from the Defendant's two phones, focusing on coverage locations near the crime scene, Whisky Jack's, and the Defendant's home between 8:00 p.m. on September 12, 2019, and 7:00 a.m. on September 13, 2019. Lieutenant Evans stated that the Defendant's first phone connected to a cell tower in the Whisky Jack's coverage area at 8:51 p.m. and again at 2:05 a.m. At 5:33 a.m. and 5:40 a.m., the phone received a text and connected to a cell tower that covered the area of the crime scene. At 6:00 a.m., the Defendant's phone received a text and connected to a cell tower that covered the Mendenhall and Shelby Drive area, away from the crime scene.

Lieutenant Evans stated that the Defendant's second phone connected to a cell tower in the Whisky Jack's coverage area at 8:55 p.m. At 5:45 a.m. and 5:51 a.m., the cell phone received several phone calls while in the coverage area of the crime scene. At 7:09 a.m., the phone pinged near the I-40/ I-240/ Sam Cooper Boulevard junction.

Lieutenant Evans stated that, between 5:33 a.m. and 6:00 a.m., the Defendant received several messages from his girlfriend expressing frustration that he was not home. At 7:49 a.m., the Defendant replied, "I'm sorry. I failed you. I'm picking myself up. I don't want anymore arguments over my stupidity so I'm correcting myself." At 7:55 a.m., the Defendant added, "Bae, passed out. Hit my starter button, burned up my starter in the parking lot of Whisky Jack's. I have to push it to start now."

Lieutenant Evans also reviewed data from H.C.'s phone. On December 18, 2018, H.C. sent the Defendant a text saying, "Merry Christmas from me and the baby." The Defendant did not respond. On April 22, 2019, H.C. informed the Defendant of B.C.'s birth and invited him to meet his son, stating she would not force or prevent the Defendant from participating in the child's life. In May and June of 2019, H.C. sent additional messages urging the Defendant to come speak with her, to which he did not respond. On August 1, 2019, she expressed disappointment that the Defendant had not contacted her.

On August 30, 2019, the Defendant texted H.C. about child support, stating, "I guess I'm going to be your b*tch for the next 18 years." When H.C. told him she had given him the opportunity to take responsibility, he replied that he had offered to pay for an abortion. The Defendant expressed that he was unprepared to be a parent, and he thanked H.C. for "making [him] lose everything." When the Defendant asked H.C. how they could resolve the situation, she replied that the only way was for him to pay child support. The Defendant responded with a cartoon photograph stating, "Using someone's child to hurt them makes you a piece of sh*t." When H.C. did not respond to this message, the Defendant sent a message stating "Okay, I'll play your game." H.C. reiterated that she was not playing games but trying to care for her son, and their text exchanges ended. On September 12, 2019, a few hours before she was killed, H.C. sent a group message to family with a video of B.C. preparing for bed.

At the conclusion of trial, the jury convicted the Defendant as charged of two counts of first-degree premeditated murder, first-degree murder in the perpetration of or the attempt to perpetrate aggravated child abuse, aggravated child abuse, aggravated arson, and especially aggravated burglary. The Defendant and the State subsequently entered an agreed upon an effective sentence of life without parole. Thereafter, the Defendant timely filed a motion for a judgment of acquittal or, in the alternative, a motion for a new trial, which was denied by the trial court. This timely appeal followed.

## ANALYSIS

The Defendant contends that the evidence is insufficient to support his convictions. He does not allege the State failed to prove beyond a reasonable doubt the elements of the offenses. Rather, the Defendant argues the State failed to prove his identity as the perpetrator of the crimes. He asserts that there was no direct evidence that he was the perpetrator of the homicides, and the circumstantial evidence presented "does not tell a complete story." The Defendant further contends that law enforcement "failed to investigate critical pieces of evidence" and "fixated on him as a perpetrator to the detriment of justice." The State responds that both the direct and circumstantial proof establish the Defendant as the perpetrator. We agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "Because a verdict of guilt removes the presumption of innocence

and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). This court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

The Defendant appeals his convictions of two counts of first-degree premeditated murder, first-degree murder in the perpetration of or the attempt to perpetrate aggravated child abuse, aggravated child abuse, aggravated arson, and especially aggravated burglary. Tenn. Code Ann. §§ 39-13-202; -202(a)(2), 39-15-402; 39-14-302, 39-14-404(a). Because the Defendant's argument focuses solely on whether the evidence was sufficient to establish his identity as the perpetrator, we will limit our analysis to the law governing proof sufficient to establish identity.

"The identity of the perpetrator is an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. State v. Cribbs, 967 S.W.2d 773, 779 (Tenn. 1998). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. "In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 203 Tenn. 440, 313 S.W.2d 451, 456-58 (1958)). However, "[t]he jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable, 313 S.W.2d at 457). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Sisk, 343 S.W.3d 60, 65 (Tenn. 2011) (citing State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010)). The court in Dorantes specifically adopted the standard for circumstantial evidence established by the United States Supreme Court in Holland:

> "Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events

in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more."

Dorantes, 331 S.W.3d at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). So long as the evidence of the defendant's guilt is established beyond a reasonable doubt, the proof need not exclude every other reasonable hypothesis except that of the defendant's guilt. Id.

Viewing the evidence in the light most favorable to the State, the Defendant was upset with victim H.C. because she was attempting to arrange child support payments for their child, B.C. By his own admission, on the night of the murders, the Defendant entered H.C.'s home through a back kitchen window. His DNA was also found on that window. Additionally, cell phone location analysis showed the devices for the Defendant were communicating with towers near the crime scene and LPR evidence placed the Defendant's vehicle on a road located immediately behind H.C.'s backyard. The State also presented evidence regarding the contentious relationship between the Defendant and H.C. Prior to the murders, the Defendant and H.C. had been in conflict over child support and a court-ordered paternity test scheduled for the morning of the crime. Here, the Defendant argues that the evidence presented at trial regarding his identity as the perpetrator is insufficient because it was circumstantial and failed to "tell a complete story." He contends that law enforcement "fixated" on him as the perpetrator, failed to pursue other critical evidence, wrongly attributed a Vans shoe print at the scene to him, and failed to collect hairs found at the crime scene. Each of the Defendant's arguments raised on appeal were presented to and rejected by the jury in this case. State v. McKnight, 900 S.W.2d 36, 50 (Tenn. Crim. App. 1994), overruled on other grounds by State v. Collier, 411 S.W.3d 886 (Tenn. 2013). As previously stated, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Accordingly, we conclude that the evidence was sufficient for any rational juror to find that the Defendant was the perpetrator of each of the crimes in this case beyond a reasonable doubt. The Defendant is not entitled to relief.

## CONCLUSION

Upon review, we affirm the judgments of the trial court.

s/ Camille R. McMullen

CAMILLE R. MCMULLEN, JUDGE